UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL FREDERICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15 CV1149 ACL |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Michael Frederick brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration Commissioner's denial of his application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental

Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Frederick's severe mental

impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform

jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is

presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the matter is reversed and remanded for further proceedings.

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d)
of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this suit.

# I. Procedural History

Frederick protectively filed his applications for DIB and SSI on November 21, 2011, and November 18, 2013, respectively. (Tr. 122-28, 1593B-H.) He alleged that he became disabled on May 1, 2010, due to schizophrenia and depression. (Tr. 170.) Frederick's claims were denied initially. (Tr. 42-46.) Following an administrative hearing, Frederick's claims were denied in a written opinion by an ALJ, dated May 27, 2014. (Tr. 14-26.) Frederick then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 11, 2015. (Tr. 27, 7-10.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Frederick claims that the ALJ failed to properly evaluate Frederick's RFC. Frederick also argues that the ALJ failed to properly evaluate the opinion evidence.

# II. The ALJ's Determination

The ALJ stated that Frederick met the insured status requirements of the Social Security Act through September 30, 2011.[2] (Tr. 16.) The ALJ found that Frederick had not engaged in substantial gainful activity since his alleged onset date of May 1, 2010. *Id.*

In addition, the ALJ concluded that Frederick had the following severe impairments: schizophrenia and depression. (Tr. 17.) The ALJ found that Frederick did not have an impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

---

[2]To be entitled to DIB under Title II, Frederick must establish that he was disabled prior to the expiration of his insured status on September 30, 2011. *See* 20 C.F.R. 404.130. To be entitled to SSI under Title XVI, he must show that he was disabled while his application was pending. *See* 42 U.S.C. 1382c; 20 C.F.R. " 416.330 and 416.335. Thus, the relevant time period in this case is from May 1, 2010 through May 27, 2014.

As to Frederick's RFC, the ALJ stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can only understand, remember, and carry out simple, repetitive tasks. He can have occasional interaction with supervisors, co-workers, and the public. He can have no transactional interactions with the public, and he is limited to performing in low stress jobs, defined as requiring only occasional decision-making, and having occasional change in work setting.

(Tr. 18.)

The ALJ found that Frederick's allegations regarding his limitations were not entirely credible. (Tr. 19.) In determining Frederick's RFC, the ALJ indicated that she was assigning "strongest weight" to the opinion of treating psychiatrist Adarsh S. Reddy, M.D. (Tr. 24.) The ALJ discredited the opinions of treating psychiatrists Angela Reiersen, M.D., and Marie Gebara, M.D.; and of treating counselor, Brooke Justis, MSW, LCSW. (Tr. 21-23.)

The ALJ further found that Frederick is unable to perform any past relevant work. (Tr. 24.) The ALJ noted that a vocational expert testified that Frederick could perform jobs existing in significant numbers in the national economy, such as addresser, collator operator, or housekeeper. (Tr. 25.) The ALJ therefore concluded that Frederick has not been under a disability, as defined in the Social Security Act, from May 1, 2010, through the date of the decision. (Tr. 26.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on November 21, 2011, the claimant is not disabled as defined in sections 216(i) and 223(d) of the Social Security Act prior to September 30, 2011.
>
> Based on the application for supplemental security income protectively filed on November 18, 2013, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 26.)

## III.   Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted). *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

### III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security

Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively

disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to

make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical

findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

### IV. Discussion

Frederick argues that the ALJ erred in evaluating his RFC, and in evaluating the medical opinion evidence.

### 1. RFC

Residual functional capacity is defined as that which a person remains able to do despite her limitations. 20 C.F.R. § 404.1545(a), *Lauer v. Apfel,* 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. § 404.1545(a); *Anderson v. Shalala,* 51 F.3d 777, 779 (8th Cir. 1995); *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. *Id.; Hutsell v. Massanari,* 259 F.3d 707, 711–12 (8th Cir. 2001); *Lauer,* 245 F.3d at 703–04; *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. *Hutsell,* 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant is able to perform certain functions. *Pearsall,* 274 F.3d at 1217 (8th Cir. 2001); *McKinney,* 228 F.3d at 863. The claimant bears the burden of establishing her RFC. *Goff,* 421 F.3d at 790.

The ALJ provided the following explanation for her RFC determination:

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence in the record that clearly and repeatedly shows that the claimant has compliance and coping issues that are the primary cause of his mental issues. The persuasive and consistent findings and other logical and objective evidence shows the claimant's condition is clearly controlled well on medications if and when he is compliant with them. I see no persuasive evidence the claimant is more limited than set out in this finding despite having reviewed every page of every exhibit in this file. The most persuasive longitudinal evidence of record most fully supports the residual functional capacity I have recited herein. Despite many duplicative exhibits having been removed, many exhibits have reports of the same periods of hospital visits and hospitalizations each consistently stating the claimant was noncompliant, and always responded well to medication with little or no side effects through years of records from Barnes-Jewish Hospital, Washington University School of Medicine, and other providers. As a result of reviewing all of this evidence, the residual functional capacity is the best reflection of the claimant's ability to function day in and day out, and will allow him to work on a regular and continuing basis without being overwhelmed by his coping issues and other emotional problems.

(Tr. 24.)

Frederick argues that the ALJ erred in attributing all of his symptoms from schizophrenia and depression to non-compliance and issues unrelated to the ability to work. He further contends that the ALJ's findings are inconsistent with the very nature of schizophrenia, which includes periods of remission and relapse. The undersigned agrees.

The Court notes that recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation. *See Rowland v. Astrue,* 673 F. Supp.2d 902, 920–21 (D.S.D. 2009) (citing *Jones v. Chater,* 65 F.3d 102, 103 (8th Cir. 1995)). As stated by the Eighth Circuit, "[i]t is inherent in psychotic illnesses that periods of remission will occur [.] ... Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods." *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996) (internal quotation marks and citations omitted). Given that a claimant's level of mental functioning may seem relatively adequate at a

specific time, proper evaluation of the impairment must take into account a claimant's level of functioning "over time."   20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(D)(2).

The relevant objective medical evidence is summarized below.

Frederick saw Angela Reiersen, M.D., Assistant Professor of Psychiatry, Washington University School of Medicine, from October 2002 to April 2012, for treatment of his mental impairments.   (Tr. 656.)   In an Assessment for Social Security Disability Claim dated September 21, 2012, Dr. Reiersen summarized Frederick's psychiatric history.   She stated that Frederick was first treated at the Washington University Child and Adolescent Psychiatry Clinic in March 1999, at the age of twelve.   *Id.*   Dr. Reiersen evaluated him in October 2002 in the emergency room when he had a disorganized psychotic episode, which required hospitalization.   *Id.*   During that episode, Frederick showed very disorganized speech and unusual behaviors such as removing his braces with a screwdriver.   *Id.*   Dr. Reiersen stated that, once stabilized, on medication, Frederick had a period of "several years where he functioned relatively well most of the time." *Id.*   In spring of 2010, Frederick stopped his antipsychotic medication "due to losing insurance and difficulty in paying for the medication."   *Id.*   This resulted in recurrence of psychotic symptoms.   *Id.*   Since that time, Frederick has had "frequent exacerbations of his symptoms," which has interfered with his performance at school and employment settings, and resulted in additional hospitalizations and medication changes.   *Id.*   Dr. Reiersen last saw Frederick on April 3, 2012, at which time she discussed a plan for Frederick to transition to an adult psychiatry clinic.   *Id.*

Records from Barnes-Jewish Hospital and Dr. Reiersen reveal that Frederick was hospitalized from May 4, 2010, through May 6, 2010, with symptoms of perceptual disturbances, visual hallucinations, and suicidal ideation.   (Tr. 270, 284, 458.)   Frederick's father had lost his

job, which resulted in Frederick losing his health insurance.  *Id.*  Consequently, Frederick was unable to afford his Abilify[3] and relapsed.  *Id.* Frederick was restarted on his medications.  *Id.*

Frederick saw Dr. Reiersen for follow-up on May 17, 2010, at which time he was back on his medications and was feeling better.  (Tr. 459.)  He had no suicidal thoughts or overt psychotic symptoms, although he was still somewhat nervous in crowds.  *Id.*  Dr. Reiersen diagnosed Frederick with schizophrenia, disorganized type;[4] and a GAF score of 65.[5]  *Id.*  She continued his medications.  *Id.*

Frederick was hospitalized again from November 30, 2010, through December 1, 2010, after reporting suicidal thoughts and a return of psychotic symptoms.  (Tr. 366, 378.)  Frederick reported that he had run out of medications one week prior because he was unable to afford them. (Tr. 284, 366, 383.)  Frederick was described by an examining psychiatrist as "completely reliable."  (Tr. 381.)  Frederick was diagnosed with re-emergence of psychosis and depressive symptoms in the setting of medical noncompliance due to financial stressors.  (Tr. 389.)  He was switched from Abilify to Haldol[6] for financial reasons.  *Id.*  At the time of his discharge, he was

---

[3]Abilify is an anti-psychotic drug indicated for the treatment of disorders such as schizophrenia. *See* WebMD, http:// www.webmd.com/drugs (last visited February 2, 2017).

[4]A severe type of schizophrenia characterized by the predominance of incoherence; blunted, inappropriate or silly affect; and the absence of systematized delusions.  *Stedman's Medical Dictionary* 1729 (27th ed. 2000).

[5]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("*DSM IV–TR*").

[6]Haldol is an anti-psychotic drug indicated for the treatments of disorders such as schizophrenia. *See* WebMD, http:// www.webmd.com/drugs (last visited February 2, 2017).

assessed a GAF score of 40 to 50.[7]   (Tr. 378.)

At Frederick's December 7, 2010 follow-up with Dr. Reiersen, he reported that he had to drop out of school that semester because he was not doing well cognitively.   (Tr. 455.)   He had no psychotic symptoms or suicidal ideations at that time.   *Id.*   Dr. Reiersen diagnosed Frederick with schizophrenia, disorganized type; and assessed a GAF score of 65.   (Tr. 456.)

Frederick presented to the emergency room at Barnes-Jewish Hospital on April 20, 2011, with complaints of hearing voices, and experiencing suicidal ideations.   (Tr. 278.)   He reported that he was failing school, he had lost his job due to distraction, and he had problems with his fiancée's family.   (Tr. 282.)   Emergency room physician Christopher S. Sampson, M.D., noted that Dr. Reiersen reported that Frederick and his fiancée have "very good insight into his illness and do not make unreasonable requests for admission.   Dr. Reiersen also notes that when the patient decompensates, his decompensation is very rapid."   (Tr. 284.)   Frederick was diagnosed with paranoid schizophrenia, and acute depression.   (Tr. 290.)   His dosage of Haldol was increased, and he was excused from school for a week.   *Id.*

Frederick returned to the emergency room on April 27, 2011, with complaints of hearing voices, and wanting to hurt himself.   (Tr. 298.)   He had a plan to take a knife and slit his wrist. *Id.*   Frederick reported increased stress, difficulty sleeping at night, sleeping during the day, and missing school.   (Tr. 303.)   It was noted that Frederick was taking his medications.   *Id.*   Dr. Reiersen had reduced the dosage of Haldol secondary to Frederick's reports of sedation two days prior.   *Id.*   Dr. Reiersen agreed with the emergency room physician's plan to increase Frederick's

---

[7]A GAF score of 31–40 indicates some impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work).   *DSM IV–TR* at 34.   A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   *Id.*

dosage of Haldol.  *Id.*

Frederick was hospitalized from June 22, 2011, through June 27, 2011, due to complaints of hearing voices and experiencing suicidal thoughts.  (Tr. 401.)  Dr. Sampson noted that Frederick was "actually quite compliant and self aware," and was in need of admission.  (Tr. 402.)  Frederick reported the he had had a "bad interview" for a job.  (Tr. 403.)  He complained of symptoms including worsening low mood with disrupted sleep, inability to enjoy activities, inability to maintain concentration, and suicidal ideation with plan to overdose on his medications.  *Id.*  He had attempted to use coping skills but these strategies were ineffective in helping either the hallucinations or the low mood.  *Id.*  Frederick's dosages of Haldol and Paxil[8] were increased, and his mood improved.  (Tr. 414.)  At the time of discharge, he was not completely at baseline but was stable for discharge.  *Id.*  Dr. Sampson diagnosed Frederick with paranoid schizophrenia and depression not otherwise specified, with a GAF score of 51 to 60.  (Tr. 413-14.)

On July 19, 2011, Frederick reported that he had not experienced any psychotic symptoms or suicidal ideation since his discharge.  (Tr. 443.)  He continued to experience poor concentration, which had been long-standing since the initiation of Haldol; and excessive sedation.  *Id.*  His mood had improved since his medications were increased.  *Id.*  Dr. Reiersen diagnosed Frederick with schizophrenia, disorganized type; and depression not otherwise specified; and assessed a GAF score of 70.  (Tr. 44.)  In September 2011, Dr. Reiersen stated that Frederick had shown reasonable control of his positive[9] symptoms but continued to struggle with low

---

[8]Paxil is indicated for the treatment of depression.  *See* WebMD, http:// www.webmd.com/drugs (last visited February 2, 2017).

[9]One of the acute symptoms of schizophrenia, including hallucinations, delusions, thought disorder, loose associations, ambivalence, or affective lability.  *Stedman's* at 1885.  "Negative" symptoms are deficit symptoms of schizophrenia that follow from diminished volition and executive function including inertia, lack of involvement with the environment, poverty of thought, social withdrawal, and blunted affect.  *Id.*

concentration, and low motivation which were significantly interfering in his social and occupational functioning. (Tr. 441.) Frederick was a senior in college, but struggled to focus and keep up his grades. (Tr. 440.) Dr. Reiersen's diagnoses remained unchanged. (Tr. 441.) Dr. Reiersen started Frederick on a trial of Risperdal[10] because it was a generic medication. *Id.* On April 3, 2012, Frederick's last visit with Dr. Reiersen, Frederick reported he was doing well and was taking classes part-time. (Tr. 437.) He was seeing a therapist weekly, and reported compliance with his medications. *Id.* Dr. Reiersen found that Frederick had good control of his symptoms overall with Risperdal. (Tr. 438.) She noted a mild concern that Frederick's had more disorganization of thought process, and noted this increased tendency to make cynical comments. (Tr. 439.)

Frederick was hospitalized from June 3, 2012, through June 6, 2012, due to a worsening of psychotic and depressive symptoms. (Tr. 471.) Frederick reported increasing stresses including financial stressors; a stressful relationship with his parents; problems with maintaining his grades in college, for which he was recently suspended; and employment problems. *Id.* Frederick complained of auditory hallucinations of voices telling him derogatory things, increased paranoia regarding his girlfriend's father, and depressive symptoms. *Id.* Frederick's outpatient treating psychiatrist confirmed that an increase in Frederick's psychotic symptoms caused a concurrent worsening of depressive symptoms. *Id.* Frederick was assessed a GAF score of 31 to 40. (Tr. 475.) He reported that he had been compliant with his medications. (Tr. 476.) Frederick's dosage of Risperdal was increased during his hospital stay, and his suicidal ideations resolved. *Id.*

Frederick was hospitalized again from June 28, 2012, through July 2, 2012, with suicidal

---

[10]Risperdal is an anti-psychotic drug indicated for the treatment of disorders such as schizophrenia. *See* WebMD, http:// www.webmd.com/drugs (last visited February 2, 2017).

ideations and worsening auditory hallucinations. (Tr. 490.) He was found to be reliable. *Id.*
Frederick reported three weeks of worsening symptoms, including: poor appetite, poor sleep,
increased thoughts of guilt about eating, increased thoughts of worthlessness, low energy and
anhedonia with loss of interest in watching sports and watching television. (Tr. 495.) The
worsening symptoms developed in the context of increased financial stressors and family
problems. *Id.* The examining physician found that Frederick had an intent to die because of all
of his social stressors. (Tr. 497.)

Frederick presented to the emergency room on September 12, 2012, with complaints of
increased hallucinations and difficulty telling what was real and what was not. (Tr. 748.) It was
noted that Frederick had been following closely with Dr. Marie Anne Gebara since his last
admission, and that Dr. Gebara planned to change his medications from Risperdal to Abilify. (Tr.
750.) He was not suicidal, and later reported that he was ready to go home. *Id.* Frederick was
discharged with instructions to continue his medication regimen and follow-up with Dr. Gebara.
(Tr. 752.) Frederick saw Dr. Gebara on September 14, 2012, at which time she found Frederick
was stable for outpatient care. (Tr. 752.) She recommended continued therapy with Kirk
Bryant. *Id.*

Frederick returned to the emergency room on September 18, 2012, with complaints of
suicidal ideations and auditory hallucinations. (Tr. 1108.) He reported hearing voices telling
him to kill himself. *Id.* Frederick reported that he did not believe the Risperdal was working so
he did not take it that night. (Tr. 1111.) Frederick was discharged to home, with instructions to
take his antipsychotic medications and follow-up with Dr. Gebara the next day. (Tr. 1115.)

Frederick was admitted at the St. Louis Regional Psychiatric Stabilization Center from
October 1, 2012, through October 8, 2012, due to complaints of suicidal ideations with some

anxiety and hallucinations.   (Tr. 1146.)   Frederick reported that he had been taking his

medications, and attributed his increased stress resulting from losing his job to his current

symptoms.   (Tr. 1127.)   Frederick was extremely agitated, paranoid, and suspicious.   (Tr. 1131.)

Upon his discharge, Narsimha Muddasani, M.D., noted that staff was unable to completely control

his oppositional behavior, as "this is his baseline social functioning."   (Tr. 1147.)   He diagnosed

Frederick with bipolar disorder, and personality disorder.   (Tr. 114.)

On November 27, 2012, Frederick presented to the emergency room at Barnes-Jewish

Hospital, with complaints of being suicidal for the past couple weeks with a plan to slit his wrists.

(Tr. 704.)   He indicated that his suicidal thoughts were precipitated by an argument with his

brother, and that he heard voices the previous day telling him to kill himself.   (Tr. 707.)

Frederick reported that he took his medications regularly.   *Id.*   He was admitted to the psychiatric

unit.   *Id.*   Frederick was discharged the next day, at which time he was diagnosed with

schizophrenia, disorganized; depression not otherwise specified; and was assessed a GAF score of

45 to 50.   (Tr. 719.)   The attending physician stated that Frederick's symptoms were most

consistent with "negativism" found in schizophrenia.   (Tr. 720.)   Frederick had had a number of

emergency room visits when his stressors "result in exacerbation of psychosis and suicidal

ideation."   *Id.*   His medications were continued.   *Id.*

Frederick was admitted from December 23, 2012, through December 25, 2012.   (Tr. 670.)

Frederick had called "911" because he was hearing voices telling him to jump into traffic in the

context of psychosocial stressors and threatened eviction.   *Id.*   The emergency room physician

noted that Frederick was well known to the hospital, and had "poor coping skills."   *Id.*   Frederick

had presented to the emergency room just three days prior for similar complaints and was

discharged with instructions to follow-up with his psychiatrist.   *Id.*   Examining physician Brian

R. Froelke, M.D., stated that Frederick had a long-standing history of schizophrenia and also reported depressive symptoms that were in response to stressors or could be secondary to schizophrenia. (Tr. 672.) Dr. Froelke discussed with Frederick the need to develop coping skills. *Id.* Frederick continued to be non-redirectable and preoccupied with trying to kill himself. *Id.* He displayed poor future planning. *Id.* Upon discharge, his mood symptoms improved. (Tr. 684.)

Frederick presented to the emergency room three times in February 2013, and one time in March 2013, due to symptoms of schizophrenia and depression. (Tr. 940, 909, 880, 838.) On February 15, 2013, Dr. Gebara stated that Frederick's psychotic symptoms have included thought and speech disorganization, auditory hallucinations, and persecutory delusions that have affected his social functioning, with some residual symptoms when he is not psychotic. (Tr. 797.) He also had depressive symptoms including low mood, anhedonia, and poor sleep and appetite. *Id.* Dr. Gebara indicated that Frederick seemed to be doing much better after switching from Risperdal to Abilify, and that he was working on coping skills to avoid repeated emergency room visits. *Id.* She assessed a GAF score of 51 to 60. *Id.* On February 26, 2013, Frederick reported that he quit his job because it was "very stressful and too mentally taxing for him." (Tr. 790.) He reported paranoid ideation and auditory hallucinations. *Id.* Frederick continued to work on coping skills for managing stress and psychotic symptoms. *Id.*

Frederick was hospitalized from April 29, 2013, to May 1, 2013, due to complaints that his medications were bugs and he felt like his wrists were bleeding. (Tr. 1363.) He had not taken his Seroquel the night of admission due to his belief that it was a bug. (Tr. 1364.) Frederick also reported hearing voices, including a voice telling him to jump into traffic. *Id.* He reported a recent stressor of getting fired from a janitorial job because he had "not been able to go to

bathroom due to Seroquel." (Tr. 1369.) The emergency room physician noted that Frederick kept picking at his wrist and stating "it's bleeding look." *Id.* Frederick was admitted due to depressive symptoms and psychotic symptoms. (Tr. 1370.) He was noted to have features indicating "possible decompensation from schizophrenia all in context of depressive symptoms x 1 week." *Id.* Frederick's "outpatient psychiatrist" noted that Frederick "begins having hallucinations with life stressors, and that going to the Emergency Department may represent a coping mechanism." (Tr. 1388.) Upon discharge, Frederick was diagnosed with disorganized schizophrenia and depression NOS, and was continued on his medications. (Tr. 1388.)

Frederick was hospitalized again from May 8, 2013, through May 13, 2013, with complaints of hearing voices again telling him to kill himself. (Tr. 1316.) He stated he felt like he was going to jump out of his skin. *Id.* Frederick reported that he did not remember if he took his medications. *Id.* Upon discharge, it was stated that Frederick had a history of disorganized schizophrenia and presented with "visual, auditory and tactile hallucinations, and depressive mood in the setting of possible medication non-compliance." (Tr. 1339.) Frederick was given an injection of Invega[11] and his auditory and visual hallucinations subsided two days later. *Id.*

Frederick started seeing Adarsh Reddy, M.D., at the Barnes-Jewish Hospital Outpatient Psychiatry Clinic, on July 16, 2013. (Tr. 1532.) Frederick had last been seen on an outpatient basis by Dr. Gebara in June 2013. *Id.* Frederick reported that he had been doing better since his discharge. (Tr. 1533.) He started seeing a new therapist, Brooke Justis, and was working on cognitive behavior therapy techniques. *Id.* Dr. Reddy found that Frederick was stable on Invega

---

[11]Invega is an anti-psychotic drug indicated for the treatment of conditions such as schizophrenia. The medication is injected into a muscle. *See* WebMD, http:// www.webmd.com/drugs (last visited February 2, 2017).

and Cymbalta,[12] and that his mood was "good for the most part."  (Tr. 1535.)  Dr. Reddy

diagnosed Frederick with schizophrenia, disorganized type; depression, not otherwise specified;

and assessed a GAF score of 50 to 60.  (Tr. 1532.)  Dr. Reddy noted that Frederick had a "history

of decompensation with psychosis and suicidal ideations but at this time he appears to be relatively

stable and as such, is under moderate risk of self-harm or harm to others."  *Id.*  She continued

Frederick's medications, and praised him for being compliant with his medications.  (Tr. 1535.)

Dr. Reddy also encouraged Frederick to continue to go to the Independent Center to socialize and

be active.  *Id.*

Frederick presented to the emergency room on July 21, 2013, with complaints of

hallucinations.  (Tr. 1509.)  He heard voices telling him to jump into traffic and was visualizing

his wrists bleeding.  *Id.*  Frederick later reported feeling better and was discharged.  (Tr. 1510.)

Frederick returned to the emergency room on July 30, 2013, with the same complaints.

(Tr. 1480.)  He was transferred to the Psychiatric Stabilization Center on July 31, 2013.[13]  *Id.*

Frederick saw Dr. Reddy for follow-up on August 26, 2013.  (Tr. 1446-47.)  Frederick

had just been discharged the previous day from the Neurology department after complaints of

dizziness, nausea, blurring of vision, and vertigo.  (Tr. 1446.)  Frederick reported a good mood,

but his girlfriend indicated that he was quite irritable and gets upset about trivial things.  *Id.*  He

had been seeing his therapist, Ms. Justis, almost on a weekly basis and they were working on

improving coping strategies.  *Id.*  Dr. Reddy's diagnoses remained unchanged.  (Tr. 1447.)  Dr.

Reddy continued the monthly Invega injection and daily Cymbalta.  *Id.*

On September 23, 2013, Frederick reported that he had been doing better, and had not had

---

[12]Cymbalta is indicated for the treatment of depression.  *See* WebMD, http://
www.webmd.com/drugs (last visited February 2, 2017).
[13]These records are illegible due to the poor quality of the photocopies.

to call the crisis line for over two months. (Tr. 1407.) Frederick reported experiencing auditory hallucinations briefly and visual hallucinations a few nights prior where he felt that his wrist was bleeding. *Id.* He was able to successfully use coping mechanisms that he learned in therapy. *Id.* Frederick reported compliance with his medications. *Id.* He requested that Dr. Reddy complete paperwork for his upcoming Social Security Disability hearing. *Id.* Upon mental status examination, Dr. Reddy noted that Frederick occasionally made mildly condescending statements like "are residents supposed to get vacation?" and "maybe you don't know, but in this country every state has its own licensing procedure." *Id.* Dr. Reddy diagnosed Frederick with schizophrenia, cluster b traits,[14] and a GAF score of 70. (Tr. 1408.) He stated that Frederick reports continuing auditory hallucinations and visual hallucinations, but his symptoms are stable and he is at baseline. *Id.* Dr. Reddy stated that Frederick is "high functioning at baseline," and that he "has not been able to work and it is likely related to his poor coping strategies rather than his primary illness." *Id.* Dr. Reddy encouraged Frederick to "consider going back to school and try to obtain a job as it may give him a better chance of leading a life that he wants." *Id.*

The medical evidence summarized above does not support the ALJ's determination that Frederick's "condition is clearly controlled well on medications if and when he is compliant with them." (Tr. 24.) It is true Frederick was noncompliant with his medications for a period in 2010 due to losing his insurance and being unable to afford his medications. (Tr. 458, 366.) This led to two hospitalizations, in May 2010 and November 2010. *Id.* Frederick was switched from Abilify to Haldol for financial reasons after his November 2010 hospitalization. (Tr. 389.) There are no instances of noncompliance with medication noted again until September 18, 2012, at

---

[14]Cluster B personality disorders include Antisocial, Borderline, Narcissistic, and Histrionic Personality Disorders. *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 659–72 (5th ed. 2013) ("*DSM V*").

which time Frederick reported he did not take his medication that day he presented to the emergency room because he did not believe the Risperdal was working. (Tr. 1111.) When Frederick was hospitalized on April 29, 2013, he reported that he had not taken his Seroquel that night due to his belief it was a bug. (Tr. 1364.) Approximately a week later, during Frederick's May 8, 2013 admission, he reported that he did not remember if he had taken his medications. (Tr. 1316.)

The record does not demonstrate that Frederick was consistently noncompliant with his medications. Rather, it shows that Frederick had run out of medications and was financially unable to refill them for a period during 2010. *Cf. Brown v. Barnhart,* 390 F.3d 535, 540 (8th Cir. 2004) (lack of sufficient financial resources may justify noncompliance with prescribed treatment). Frederick's treating psychiatrist addressed his financial obstacles to compliance by changing his medication to a more affordable drug.

The other instances of noncompliance were on days when Frederick presented to the emergency room due to increased symptoms of schizophrenia—September 18, 2012, and April 29, 2013—and reported that the medication was not working or he believed the medication was a bug. He also stated that he did not remember if he had taken his medications on the day he was admitted for five-days with complaints of hearing voices telling him to kill himself on May 8, 2013. (Tr. 1316.) The Eighth Circuit has repeatedly recognized that a mentally ill claimant's noncompliance with treatment can be, and ordinarily is, the result of the mental impairment itself and cannot, with nothing more, be deemed willful or unjustifiable to such an extent that the claimant's subjective complaints relating thereto should be discredited. *See Pate–Fires v. Astrue,* 564 F.3d 935, 945-47 (8th Cir. 2009) (and cases cited therein).

Frederick's isolated instances of medication noncompliance do not support the ALJ's

finding of consistent noncompliance.   In addition, the incidents of noncompliance appear to be related to his mental impairments and are an insufficient basis to undermine the credibility of his complaints of disabling psychiatric symptoms.

Further, the record does not support the ALJ's conclusion that Frederick's condition is well-controlled when he is compliant.   After Frederick's change in medication in December 2010, he was compliant with his medications for almost two years.   In June 2011, Dr. Sampson remarked that Frederick was "actually quite compliant."   (Tr. 402.)   Despite Frederick's compliance with his medications, he was hospitalized due to psychotic symptoms and suicidal thoughts on three occasions during this period: from June 22, 2011, to June 27, 2011; June 3, 2012 to June 6, 2012; and from June 28, 2012, to July 2, 2012.   (Tr. 401, 471, 490.)   Frederick also presented to the emergency room with complaints of symptoms of schizophrenia and suicidal thoughts on three occasions: on April 20, 2011, April 27, 2011, and September 12, 2012.   (Tr. 278, 298, 748.)   During the period of October 2012 through July 2013, he was hospitalized six times (Tr. 704, 1146, 670, 1363, 1316, 1480), and presented to the emergency room on four different occasions (Tr. 940, 909, 880, 1509) due to psychotic and suicidal symptoms. Frederick's frequent inpatient admissions and emergency room visits due to psychiatric symptoms, despite his compliance during the majority of the relevant period, reveal that Frederick's mental illness was not well-controlled.

The ALJ also found that "it was not Frederick's psychosis that caused him to lose his job, but his job loss that caused his increased symptoms" (Tr. 20), and that Frederick's coping issues were the "primary cause of his mental issue" (Tr. 24).   Frederick's difficulty coping with social stressors are well-documented in the medical record.   There is also, however, significant evidence that Frederick's difficulty in maintaining employment and attending school was caused by his

psychiatric symptoms. On April 20, 2011, Frederick reported to Dr. Sampson that he had lost his job due to distraction and he was failing at school. (Tr. 282.) Dr. Reiersen reported to Dr. Sampson that Frederick had good insight into his illness, and that when he "decompensates, his decompensation is very rapid." (Tr. 284.) During Frederick's June 2011 inpatient admission, it was noted that Frederick experienced a worsening of psychiatric symptoms after having a "bad interview," and that he attempted to use coping strategies he had learned in therapy but the strategies were ineffective in helping his hallucinations or low mood. (Tr. 403.) In September 2011, Dr. Reiersen stated that Frederick was attending college but struggled to focus and keep up his grades. (Tr. 440.) Frederick was counseled by an emergency room physician about the need to develop coping skills during his December 2012 admission, but Frederick could not be redirected and was preoccupied with trying to kill himself. (Tr. 672.) On February 26, 2013, Frederick reported to Dr. Gebara that he had quit his job because it was "very stressful and too mentally taxing." (Tr. 790.) He reported that he was fired from a janitorial job in April 2013 because he had "not been able to go to the bathroom due to Seroquel." (Tr. 1369.) In addition, Frederick testified at the hearing that he had lost a job making coffee in 2012 due to becoming "symptomatic." (Tr. 1611.) The ALJ's finding that Frederick's coping difficulties and difficulty maintaining employment were not caused by his mental illness is not supported by the record.

Due to the ALJ's errors in evaluating Frederick's mental illness, she failed to incorporate sufficient limitations in Frederick's RFC. Notably, the ALJ did not account for the time Frederick would be expected to miss work due to emergency room visits and hospitalizations resulting from exacerbations in his psychotic symptoms and depression. Thus, the ALJ's RFC determination is not supported by substantial evidence in the record as a whole.

## 2. Opinion Evidence

Frederick also argues that the ALJ erred in assessing the medical opinion evidence when determining his RFC. Specifically, Frederick contends that the ALJ discredited the opinions of Drs. Reiersen and Gebara, and Ms. Justis, without indicating the specific weight assigned to the opinions. Frederick further argues that the ALJ erred in according the most weight to the opinion of Dr. Reddy.

"'It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749–50 (8th Cir. 2005) (internal marks omitted)). The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel,* 201 F.3d 1010, 1012–13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785–86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions. *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012). Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion. 20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the physician provides support for his findings, whether other evidence in the record is

consistent with the physician's findings, and the physician's area of specialty.   20 C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

Dr. Reiersen completed an Assessment for Social Security Disability Claim dated September 21, 2012, in which she stated that, when Frederick's illness is most severe, he has exhibited disorganized thinking/speech and behavior, delusions of persecutions, auditory hallucinations, reduced ability to concentrate, low mood, sleep disturbances, and/or suicidal thoughts.   (Tr. 656.)   She stated Frederick has also had prominent depressive symptoms, which seem mainly secondary to his psychotic disorder, and led to his diagnosis of Depression-Not Otherwise Specified.   *Id.*   Dr. Reiersen indicated that, on Fredrick's last visit on April 3, 2012, she diagnosed him with schizophrenia-disorganized type; and depression-not otherwise specified; and assessed a GAF score of 70.   *Id.*   She stated that Frederick's GAF score has fluctuated up and down frequently, and that Frederick can "appear to have quite good functioning during well periods, but his level of functioning tends to rapidly deteriorate when he is having recurrence of his symptoms."   *Id.*

As to Frederick's ability to work, Dr. Reiersen concluded as follows:

Based on my knowledge of this patient, he has had psychotic symptoms off and on, at least since 2002.   There was a period from approximately 2003 to 2010 where he was functioning relatively well and I believe he was able to function reasonably well in school and in any employment situations during most of that period. However, in Spring of 2010 he showed worsening of his symptoms, leading to substantial disability.   He has had increased symptoms and fluctuating ability to maintain his functioning since that time, which I believe have prevented him from maintaining sustained, full time employment since the Spring of 2010.

(Tr. 657.)

The ALJ acknowledged Dr. Reiersen's opinion that Frederick was disabled beginning in 2010 but found that it was inconsistent with Dr. Reiersen's own treatment notes, which "attribute the claimant's fluctuating symptoms to noncompliance, financial stress and job losses."   (Tr.

20-21.)   The ALJ stated that, even Dr. Reiersen's medical source statement provided a GAF score of 70, which indicates mild symptoms.   (Tr. 21.)   She further stated that Dr. Reiersen's opinion is not consistent with "her own reports regarding the cause and effect relationship of the claimant's depressive and psychotic episodes."   *Id.*

The ALJ erred in discrediting Dr. Reiersen's opinion.   Dr. Reiersen was Frederick's treating psychiatrist from October 2002, through April 2012, a period of approximately ten years. (Tr. 657.)   As such, Dr. Reiersen was the most qualified source to provide a longitudinal opinion of psychiatric functioning.   Dr. Reiersen's opinion is supported by her treatment notes.   Her records do reflect periods during which Reiersen was doing well and she assessed high GAF scores.   As Dr. Reiersen reported to Dr. Sampson, however, when Frederick decompensates, his decompensation is very rapid.   (Tr. 284.)   In September of 2011, Dr. Reiersen stated that Frederick had shown reasonable control of his positive symptoms but continued to struggle with low concentration and motivation, which were "significantly interfering in his social and occupational functioning."   (Tr. 441.)

Contrary to the ALJ's finding, Dr. Reiersen provides a reasoned analysis of her opinion that Frederick is disabled and her statement is not inherently contradictory.   She explains in her statement that, since 2010, Frederick has had "frequent exacerbations of his symptoms," which have interfered with his performance at school and employment settings, and resulted in additional hospitalizations and medication changes.   (Tr. 656.)   The medical record of Frederick's many inpatient admissions and emergency room visits discussed above supports this statement.   Dr. Reiersen does not attribute Frederick's fluctuating symptoms solely to noncompliance, or stressors as the ALJ finds.   Rather, Dr. Reiersen indicates that Frederick was noncompliant with his medications only for a period in 2010, and that his psychiatric symptoms interfere with his

occupational functioning.   Thus, the ALJ erred in discrediting Dr. Reiersen's opinion, without indicating the specific weight assigned to it.

Dr. Gebara completed a Mental Residual Functional Capacity Assessment on July 23, 2012.  (Tr. 1150.)   Dr. Gebara expressed the opinion that Frederick had marked limitations in his ability to understand, remember and carry out simple work instructions and procedures; understand, remember and carry out detailed instructions and procedures; maintain adequate attention, concentration and focus on work duties through a complete work day; make appropriate simple work related decisions; complete a normal work week without interruptions from psychologically based symptoms; work in coordination with, or in close proximity to others; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to routine changes in the work stetting; respond appropriately to routine work related stressors; maintain acceptable personal appearance and hygiene; and sustain extended periods of employment (greater than 6 months) without decompensation from periodic exacerbation of psychiatric symptoms.   *Id.*   Dr. Gebara found that Frederick had moderate limitations in his ability to maintain a work schedule and be consistently punctual, interact appropriately with the general public or customers, accept instructions and respond appropriately to criticism from supervisors or co-workers, and demonstrate reliability in a work setting.   *Id.*

The ALJ found that Dr. Gebara's opinion was inconsistent with her treatment notes, which "consistently reported no clinical findings of abnormality and reported the claimant functioned well when he was on Abilify and Paxil."   (Tr. 22.)

Dr. Gebara treated Frederick from July 2012 through June 2013.   (Tr. 501, 1548.) During this period, Frederick was hospitalized five times (Tr. 1146, 704, 676, 1363, 1316), and received emergency room treatment on five occasions (Tr. 748, 1108, 946, 880, 838).   In her

treatment notes, Dr. Gebara noted that Frederick's psychotic symptoms have included thought and speech disorganization, auditory hallucinations, and persecutory delusions that have affected his social functioning, with some residual symptoms when he is not psychotic.   (Tr. 742, 739, 797, 781.)   She stated that Frederick has also had depressive symptoms including low mood, anhedonia, poor sleep, and appetite.   *Id.*   Dr. Gebara noted that Frederick had a blunted or restricted affect; a disheveled appearance, and was occasionally odorous; and fair insight and judgment.   *Id.*   She assessed a GAF score of 51 to 60.   *Id.*

Dr. Gebara's opinion that Frederick had marked and moderate limitations was consistent with her treatment notes, as well as Frederick's frequent exacerbations resulting in hospitalizations during this period.   Thus, the ALJ did not provide sufficient reasons for discrediting Dr. Gebara's opinion.

Frederick also contends that the ALJ erred in failing to consider the opinion of Frederick's treating social worker, Ms. Justis.   Ms. Justis authored a letter on October 3, 2013, in which she stated that she had seen Frederick for counseling services five times since July 11, 2013.   (Tr. 1228.)   Ms. Justis cited Frederick's frequent hospitalizations for recurrence of severe psychiatric symptoms during the time she had been working with him.   *Id.*   Ms. Justis expressed the opinion that Frederick is "an intelligent, thoughtful, contentious young man who continuously works hard to maintain stability via regularly accessing care from his psychiatrist, therapist and daily support at Independence Center, but appears to be unable to function consistently in daily activities of living due to his chronic illness."   *Id.*

The ALJ acknowledged Ms. Justis' statement, but found that her "entire basis for making that statement was the claimant's report to her about his ongoing impairments and functional problems."   (Tr. 23.)   The ALJ stated that there is no report of clinical signs to support her

opinion.

The record does not include any treatment notes from Ms. Justis. There is no indication, however, that Ms. Justis relied on Frederick's subjective reports only when providing her opinion. Rather, Ms. Justis specifically referred to Frederick's frequent hospitalizations due to exacerbations of symptoms during the time she was treating him. The ALJ's rationale for discrediting this opinion is therefore insufficient.

The ALJ indicated that she was according "strongest weight" to the report of Dr. Reddy. (Tr. 24.) Dr. Reddy completed a Mental Residual Functional Capacity Assessment on October 10, 2013, in which he expressed the opinion that Frederick had only mild limitations in all functional areas. (Tr. 1231.) The ALJ stated that Frederick is "often not medication compliant which resulted in his episodes of decompensation." *Id.* The ALJ also found that Dr. Reddy's opinion was consistent with his records. (Tr. 23.)

Dr. Reddy treated Frederick from July 16, 2013, through September 23, 2013. On July 16, 2013, Dr. Reddy found that Fredrick had a "history of decompensation with psychosis and suicidal ideations but at this time he appears to be relatively stable and as such, is under moderate risk of self-harm or harm to others." (Tr. 1532.) Dr. Reddy praised Frederick for being compliant with his medications. (Tr. 1535.) Dr. Reddy diagnosed Frederick with schizophrenia, disorganized type, and depression NOS; and assessed a GAF score of 50 to 60. (Tr. 1532.) Frederick was admitted at the Psychiatric Stabilization Center on July 31, 2013, with complaints of hearing voices telling him to jump into traffic and visualizing his wrists bleeding. (Tr. 1480.) Dr. Reddy saw Fredrick for follow-up in August 2013, at which time his diagnoses remained unchanged. (Tr. 1446.) Frederick was seeing his therapist, Ms. Justis, almost on a weekly basis and was working on coping strategies. (Tr. 1446.) On September 23, 2011, Frederick was doing

better, but still reported experiencing auditory and visual hallucinations briefly.   (Tr. 1407.)   Dr. Reddy assessed a GAF score of 70, and found that Frederick was at baseline.   (Tr. 1408.)

The undersigned finds that Dr. Reddy's opinion that Frederick has only mild limitations in all areas of functioning is not supported by the record.   Dr. Reddy's own treatment notes reveal Frederick continued to experience hallucinations even at baseline.   On each visit except his last, Dr. Reddy assessed a GAF score of 51 to 60, which denotes moderate rather than mild symptoms. Dr. Reddy also noted that Frederick was compliant with his medications.   Despite this compliance, he was admitted at the Psychiatric Stabilization Center with psychotic and suicidal symptoms during the short period Dr. Reddy was treating him.

The ALJ cited Frederick's noncompliance as the cause for his decompensation but, as previously discussed, this is not supported by the record.   There is no question that Frederick was compliant when he was being treated by Dr. Reddy.   The ALJ also pointed out that Dr. Reddy noted in his records that Frederick did not return calls.   (Tr. 23.)   The statement to which she refers, however, was a statement Frederick made to Dr. Reddy.   On August 26, 2013, Dr. Reddy noted that he apologized to Frederick for being unable to reach him during his hospitalization, and Frederick responded "well you are just starting your third year…you are probably overwhelmed with all the work."   (Tr. 1446.)   To the extent the ALJ considered this statement evidence of Frederick's noncompliance, it was error.

The ALJ relied on the opinion of Dr. Reddy, who had treated Frederick for only a three-month period as "the most persuasive longitudinal evidence of record."   (Tr. 24.)   All of the other opinion evidence, including the opinion of Frederick's treating psychiatrist for ten years, supports the presence of much greater limitations due to the fluctuating nature of Frederick's psychiatric symptoms.

The undersigned again notes that recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation. *See Rowland*, 673 F. Supp.2d at 920-21. Here, the longitudinal picture of Frederick's mental impairment shows him to continue to exhibit symptoms of psychotic illness even through periods of regular treatment and improvement. An "improvement" in a chronic schizophrenic is not inconsistent with a finding of disability where, as here, a claimant's treating psychiatrist has not discharged him from treatment and requires frequent appointments, and other sources have concluded that his work skills are deficient. *See Hutsell,* 259 F.3d at 712–13.

## V. Conclusion

Given the ALJ's improper analysis of Frederick's mental impairments, discounting of the medical opinions of Frederick's treating sources, together with her unsupported determination to accord the greatest weight to the opinion of Dr. Reddy, the ALJ's RFC determination is not supported by substantial evidence in the record as a whole. Significantly, the RFC formulated by the ALJ fails to consider the absences from work that would be expected as a result of Frederick's visits to the emergency room or hospitalizations due to exacerbations.

For the reasons discussed above, the Commissioner's decision is not based upon substantial evidence on the record as a whole and the cause is therefore remanded to the Commissioner for further consideration in accordance with this Memorandum and Order. Upon remand, the ALJ shall properly consider the opinion evidence, and formulate a new mental RFC based on the record as a whole.

Dated:  <u>March 27, 2017</u>

<u>ABBIE CRITES-LEONI</u>
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE